562 A.2d 279

**John H. MUSSER, Appellant,**

v.

**VILSMEIER AUCTION CO., INC., Appellee,**

v.

**INTERNATIONAL HARVESTER COMPANY and Wenger's Farm Machinery, Inc.**

Supreme Court of Pennsylvania.

Argued April 10, 1989.

Decided June 30, 1989.

Lawrence G. Metzger, Lee Albert, Philadelphia, for appellant.

L. Carter Anderson, Patrick J. Stapleton, Philadelphia, for Vilsmeier Auction Co., Inc.

Edward A. Gray, for Intern. Harvester Co.

James D. Wilder, Philadelphia, for Wenger's Farm Machinery, Inc.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA and PAPADAKOS, JJ.

## OPINION

McDERMOTT, Justice.

This is an appeal from an order of the Superior Court affirming an order of the Court of Common Pleas of Philadelphia which granted appellee's motion for summary judgment in appellant's action in trespass. *Musser v. Vilsmeier Auction Co., Inc.*, 378 Pa.Super. 657, 544 A.2d 1048 (1988) (memorandum opinion).

The facts and events which led to the appeal are not in dispute. In January, 1984, the officers of Wenger's Farm Machinery, Inc., which was liquidating its assets, met with Appellee's president. Appellee is in the business of conducting auction sales of used equipment and machinery. The parties agreed that Appellee would conduct an auction of Wenger's equipment. Appellee however, never owned, operated or controlled the equipment which was to be auctioned.

Approximately two weeks prior to the sale, Appellee sent a brochure to potential buyers which listed the equipment to

be sold on Wenger's property on April 2 and 3, 1984. The brochure stated in plain print:

It is the object of the seller and auction company to conscientiously and accurately present the description and conditions contained in this advertising; however, neither the seller nor the auction company shall in any way be responsible for any errors or omissions in the description or conditions contained in this advertising.

Appellant's father, Ronald Musser, Sr., attended the auction on both dates. He signed a registration card, as did other potential buyers. The card stated: "I UNDERSTAND ALL ITEMS ARE SOLD 'AS IS' AND 'WHERE IS' without any guarantees expressed or implied. Any written or implied conditions are only guidelines and not guarantees." The catalogue distributed at registration contained a similar disclaimer. The disclaimer was verbally presented to the bidders by the auctioneers who conducted the sales as well.

On April 3, 1984, Appellant's father purchased two of the more than ninety used tractors exposed at the sale. One of them was a twenty-one year old model 3414 International Harvester Payloader. Appellant was injured by the tractor when it ran over him while he was starting it, three days after his father purchased it.

Appellant brought this action against the auction company. In his complaint he alleged that the tractor was defectively, negligently and improperly designed, tested, manufactured and distributed and was not equipped with adequate safety features or warnings. He alleged further that Appellee was or should have been aware of the defects and nevertheless implicitly warranted that the tractor was reasonably safe for use. The complaint stated three legal predicates: strict liability under the provisions of section 402A of the Restatement (Second) of Torts, negligence and breach of warranty.

Appellee answered, joined International Harvester and Wenger's Farm Machinery as additional defendants, and ultimately moved for summary judgment on the pleadings

as supplemented in affidavits, depositions and exhibits. The trial court on the basis of the submissions determined that there was no genuine issue as to any material fact and that Appellee was entitled to judgment as a matter of law. Pa.R.Civ.Pro.R. 1035(b).

Appellant appealed to the Superior Court alleging that the trial court erred in five of its determinations among which was the legal conclusion that Appellee was not a "seller" within the meaning of section 402A of the Restatement (Second) of Torts. That court in an unpublished opinion found the issues meritless. It adopted the trial court's opinion regarding the section 402A issue in its affirmation of the latter's order granting summary judgment. *Musser, supra.*

Appellant petitioned this Court and we granted leave to appeal on a single legal issue of first impression. It is: whether an auctioneer is a "seller" within the meaning of section 402A of the Restatement (Second) of Torts.

An entry of summary judgment may be granted only in cases where the right is clear and free of doubt. *Thompson Coal Co. v. Pike Coal Co.,* 488 Pa. 198, 412 A.2d 466 (1979). Summary judgment should be granted only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Consumer Party of Pennsylvania v. Commonwealth,* 510 Pa. 158, 507 A.2d 323 (1986). There are no issues of fact before us. Our task is to decide whether, as a matter of law, auctioneers are subject to the strict liability provision of the section for the sale of defective products.

We adopted the section as the law of the Commonwealth in *Webb v. Zern,* 422 Pa. 424, 220 A.2d 853 (1966). It states:

Section 402A. Special Liability of Seller of Product for Physical Harm to User or Consumer

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) the rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

On its face the section applies only to *sellers* of defective products. However, the affixation of strict liability for damages caused by defective products to sellers of those products is based on policy which has as its purpose the protection of the public against the harms such defects engender. Thus, responsibility for the safety of the products is placed on any supplier who undertakes to supply them to the consuming public. *Francioni v. Gibsonia Truck Corp.*, 472 Pa. 362, 364–367, 372 A.2d 736, 738–739 (1977). *Citing, Bialek v. Pittsburgh Brewing Co.*, 430 Pa. 176, 187 n. 2, 242 A.2d 231, 236 n. 2 (1968); Restatement (Second) Torts section 402A. The reason for the imposition of such responsibility is set forth in Comment F to the section.

The basis of the rule is the ancient one of the special responsibility for the safety of the public undertaken by one who enters into the business of supplying human beings with products which may endanger the safety of their persons and property, and the forced reliance upon that undertaking on the part of those who purchase such goods. This basis is lacking in the case of the ordinary individual who makes the isolated sale, and he is not liable to a third person or even to his buyer in the absence of his negligence.

Based on these policy considerations this Court has extended the application of the term "seller" to anyone who, as a supplier, enters into the business of supplying the

public with products which may endanger them. *Francioni;* Comment F, *supra.* Consistent with fidelity to the purpose of the policy considerations underlying the rule, we have given the term "seller" broad application and extended its conventional meaning to include those who market by sale, lease or bailment. Mr. Justice Nix,[1] writing for the Court in *Francioni,* summarized the essential consideration in broadening the meaning of the term:

> What is crucial to the rule of strict liability is not the means of marketing but rather the fact of marketing, whether by sale, lease, or bailment, for use and consumption by the public.... Where the fundamental principles are applicable, the imposition of artificial distinctions will only frustrate the intended purpose.

*Francioni,* 472 Pa. at 367, 372 A.2d at 738–739. (citations omitted).

We note however that the broadened concept of "supplier," for purposes of predicating strict liability, is not without practical limits. The limits obtain in the purposes of the policy. When those purposes will not be served, persons whose implication in supplying products is tangential to that undertaking will not be subjected to strict liability for the harms caused by defects in the products. For example, though in *Francioni* we held that the lessor under the terms of a conventional or "true lease" is a supplier within the meaning of Section 402A, we distinguished the lessor under the terms of a lease intended as security or one designed solely for financing purposes. *Nath v. National Equipment Leasing Corp.,* 497 Pa. 126, 439 A.2d 633. In *Nath* we stated the following rationale:

> That which provides the basis for fastening liability upon suppliers of products is that the supplier or manufacturer is the one that has the control over the product and places it within the stream of commerce. The party merely financing the transaction has no control over its manufacture, is not involved in the selection of the product or in any way makes a representation as to its quality or

1. Now Mr. Chief Justice Nix.

soundness. Between the financier and the ultimate purchaser, it is usually the latter who selects the goods, negotiates for its purchase and has control over its use.

While it is true that the financing makes the purchase possible, and to that limited extent the financier can be perceived to have participated in the delivery of the product, such a tangential participation in the supplying of the goods does not justify the imposition of strict liability. As noted, the financier is not supplying the chattel but rather is offering the use of money.

*Id.*, 497 Pa. at 132, 439 A.2d at 636.

Functionally, there is little difference between the tangential relationship of the financier to the supply of products and the same relationship of the auction company in this case. The auction was the *means* of marketing. The fact of marketing was the act of the seller who chose the products and exposed them for sale by means of the auction. *Francioni, supra.* The auction company merely provided a market as the agent of the seller. It had no role in the selection of the goods to be sold, in relation to which its momentary control was merely fortuitous and not undertaken specifically. Selection of the products bought was accomplished by the bidders, on their own initiative and without warranties by the auction company. *Nath.*

We discern other similarities between the financier in *Nath* and the auction company here. Like the financier the auctioneer is not equipped to pass upon the quality of the myriad of products he is called upon to auction and with which his contact is impromptu. Nor does he have direct impact upon the manufacture of the products he exposes to bids, such as would result from continuous relationships with their producers and which would be expected to provide him with influence over the latter in acting to make products safer. *See Nath* at 132, 439 A.2d at 636.

In *Francioni* and in *Nath* we listed certain factors which, when applicable, would indicate the propriety of the extension of the strict liability provision to lessors. Their applica-

bility in general is a determination of whether such an extension is warranted. They are:

> (1) In some instances the lessor, like the seller, may be the only member of the marketing chain available to the injured plaintiff for redress; (2) As in the case of the seller, imposition of strict liability upon the lessor serves as an incentive to safety; (3) the lessor will be in a better position than the consumer to prevent the circulation of defective products; and (4) The lessor can distribute the cost of compensating for injuries resulting from defects by charging for it in his business, *i.e.*, by adjustment of the rental terms.

*Francioni; Nath.*

With regard to the first factor, in every instance of which we are aware, in an auction there is a seller,[2] who is served by the auctioneer as his agent and who is or might be amenable to suit under this section, for negligence or for breach of warranty.

Secondly, Appellee is not in the business of designing and/or manufacturing any particular product or products. We fail to see how the imposition of strict liability would be more that a futile gesture in promoting the manufacture and distribution of safer products, the purpose of the underlying policy.

Nor do we perceive that the auctioneer would be in any better position than the consumer to prevent the circulation of defective products. This factor implies the existence of some ongoing relationship with the manufacturer from which some financial advantage inures to the benefit of the latter and which confers some degree of influence on the auctioneer. But, as pointed out above, there is no such relationship between the auctioneer and the manufacturer which might equip the auctioneer to influence the manufac-

2. There is no indication of record that Appellant ever brought suit against Wenger's. As new matter in Appellee's answer, it averred that Appellant brought an action against International Harvester Co., J.I. Case Co., and Tenneco, Inc. in U.S. District Court. Appellant argues in his brief that he received an inadequate settlement in that suit.

turing process.[3] We fail to see how the imposition of strict liability on the auctioneer would confer on him any influence in the manufacture of safer products.

Finally, we acknowledge that it would be possible for the auctioneer to pass on the costs of imposing strict liability upon him; possibly, as Appellant suggests, by indemnity agreements between the auctioneer and the seller. Assuredly, this would provide injured members of the public with another resource. However, despite this advantage, since it would be related to the purpose of the policy considerations underlying the section only marginally, we decline to extend the meaning of "sellers" so far.

The gravamen of 402A is that a buyer ought not be put to risk from a defective product by one who could prevent it. A seller of goods in the course of his ordinary established business is in such a position because it is his business to know the product he sells.

Sellers may sell in any fashion they choose: sky writing, signs, handbills, electronic media or any method to suit their purpose, including auction. When they do they remain liable and the agents of their method are but agents and extensions of their enterprise.

An auctioneer is generally an agent, an *ad hoc* salesman of the goods of another for a specific purpose and a specific time. He bears no relation to the manufacturer or the goods, beyond their immediate sale. Unless an auctioneer deals exclusively for a manufacturer or business enterprise, or buys and deals regularly in his product, he is the medium and the message but not a regular seller as conceived in 402A. An auctioneer who specializes in the product of a single manufacturer or specific manufactured good is its seller, and "auctioneer" would be only a euphemism that

---

**3.** We note that the catalogue for the sale out of which this action grew lists more than ninety different tractors. Included in the list were various models produced by: John Deere, International Harvester, Farmall, Ford, Allis Chalmers, Case, Massey Ferguson, Moline, White, Oliver, Drutz, Leyland, Coop and Kubota. On nineteen pages, with approximately twenty-two items each page, the catalogue lists myriad combines, plows, discs, cultivators, bailers, mowers, harvesters, loaders, etc.

cannot elude liability. Where he is only a salesman or agent for a given time and place, he can bear no relationship to the dealer or manufacturer sufficient to achieve the purpose of protecting the buyer from defective manufacture. Nor does he pretend to do so. He is understood only to sell for that occasion and to offer the goods as the goods of another, made by another, and regularly sold by another under different terms and conditions than auction.

The auctioneer in this case sold machinery owned by another in liquidation of its business. He was not in the business other than to preside over its end and duties owed the buyer were not his because he bore no relation to either maker or seller.

An auctioneer is an *ad hoc* salesman of another's goods and unless there is a direct continuous course of dealing with a manufacturer or sales organization for their specific products he remains only an agent, salesman or liquidator of a business; a similarity not far from the printer of handbills, the publisher of a newspaper or any medium that exposes the goods of another for sale.

Therefore for the reasons set forth above we conclude that the attachment of strict liability of "sellers" to auctioneers such as Appellee would be of minimal effect in advancing the purposes of the policy considerations underlying section 402A of the Restatement (Second) of Torts. Accordingly, we hold that auctioneers are not "sellers" within the meaning of that section.

The order of the Superior Court is affirmed.

LARSEN, J., files a dissenting opinion, in which PAPADAKOS, J., joins.

PAPADAKOS, J., files a dissenting opinion.

LARSEN, Justice, dissenting.

I dissent. The question presented in this case is whether an auction company is liable as a seller of goods under the Restatement (Second) of Torts § 402A, adopted by this court in *Webb v. Zern*, 422 Pa. 424, 220 A.2d 853 (1966) and

expanded in *Francioni v. Gibsonia Truck Corp.*, 472 Pa. 362, 372 A.2d 736 (1977).

In *Francioni* this court extended the application of Section 402A specifically to "lessors" of goods and in a general sense to anyone:

> "who enters into the business of *supplying* human beings with products which may endanger the safety of their persons and property ..." Restatement (Second) of Torts § 402A comment f. What is crucial to the rule of strict liability is not the means of marketing but rather the fact of marketing, whether by sale, lease or bailment, for use and consumption by the public.

*Id.*, 472 Pa. at 367, 372 A.2d at 738 (emphasis added, some citations omitted).

In my view an auction company is a "supplier" of goods subject to strict liability under Section 420A. As I stated in *Nath v. National Equipment Leasing Corp.*, 497 Pa. 126, 439 A.2d 633 (1982), (in which I urged the court to extend "supplier" liability to entities which provide products to the public under financing leases) "[i]t is beyond dispute that in Pennsylvania the imposition of strict liability has been premised on the need to relieve consumers of a burden which may be intolerable to one upon whom caprice has placed it and to shift that burden to those whose business it is to *traffic in commerce*". *Id.*, 497 Pa. at 135, 439 A.2d at 637–638 (Larsen, J. dissenting).

The majority, in this case, does not dispute that Vilmeier Auction Company is a "supplier" of goods and that the auction was a "means of marketing" the goods in the stream of commerce. It distinguishes, however, the "auctioneer" as a supplier to which liability does not attach because: 1) it is "not equipped to pass upon the quality" of the goods it markets; 2) it does not have a "direct impact" upon the manufacture of the goods; and 3) there is no "continuous relationship" between it and the manufacturer of the goods. The flaw in this analysis is that the majority, again, as in *Nath*, is erroneously injecting concepts of

negligence into a Section 402A case where such concepts have no place. Indeed, as I stated in *Nath:*

> ... we have consciously and consistently rejected an approach to strict liability which is predicated upon any element of fault, knowledge of the trading parties (or lack thereof), consumer expectations, or other elements alien to defendant identification on bases other than their participation *at any stage* in the manufacture or marketing (in any fashion) of products.

*Id.,* 497 Pa. at 135–136, 439 A.2d at 638. In this case the pertinent factors for extending strict liability, as set forth in *Francioni,* are all present: 1) the auctioneer may be the only member of the marketing chain available for redress; 2) the extension of liability will serve as an incentive to safety; 3) the auctioneer is in a better position than the consumer to prevent the sale of defective products; and 4) the auctioneer can redistribute the cost of compensating for injuries by increasing its fees or percentage of receipts of sale. *Id.* 427 Pa. at 368–369, 372 A.2d at 739. *See also, Nath* at 136, 439 A.2d at 638 (Larsen, J. dissenting).

Accordingly, Vilmeier Auction Company meets the *only* proper test for determining liability under Section 402A. Thus, I would reverse the order of the Superior Court, which affirmed the order of the Court of Common Pleas granting Appellee's motion for summary judgment, and remand the case for further proceedings consistent with this opinion.

PAPADAKOS, J., joins this dissenting opinion.

PAPADAKOS, Justice, dissenting.

I join the Dissenting Opinion authored by Mr. Justice Larsen because of the nature of the services furnished by the Vilsmeier Auction Co., Inc. I write separately, however, to note that I am not prepared to extend the application of Section 402A, Restatement (Second) of Torts, to the type of auctioneer who comes to the premises of the owners of goods, wares, etc., and offers them in lot, or individually, to the highest bidder. I do not suggest that the majority

opinion or the dissenting opinion covers this area of auction-eering. I merely wish to make my position clear in the matter.