**Swed v. Moran**

C.P. of Monroe County, no. 882 Civil 1994.

*Thomas J. Newell,* for plaintiffs.
*Frank A. Baker III, Paul M. Schaffer* and *Paul E. Smith,* for defendants.

WALLACH MILLER, *J.,* July 17, 1996—On April 17, 1992, plaintiff Sharon A. Swed was a passenger in a 1976 Chevrolet Blazer driven by her husband Mark E. Swed. At the time, plaintiffs were travelling down Totts Gap Road near Delaware Water Gap Country Club. Plaintiff and her 9-year-old son were seated in the passenger seat and no one in the vehicle was wearing seat belts. Immediately after going around a curve, plaintiffs came upon a golf cart occupied by defendants John R. Moran and Christopher J. Moran which had come from the golf course and was crossing Totts Gap Road to reach another section of the golf course. Plaintiff's husband swerved to avoid the golf cart, hit an embankment and the Chevrolet Blazer flipped on its roof. Plaintiff wife alleges that her head hit the windshield and her knee hit the glove box. Her husband and son were not injured.

On April 7, 1994, plaintiffs filed a complaint sounding in negligence against the golf course and occupants of the golf cart. Defendant Delaware Water Gap Country Club filed an answer, new matter and new matter joining husband as an additional defendant on June 7, 1994. Defendants Moran followed on July 6, 1994. Discovery was conducted over the course of time. Defendants Delaware Water Gap Country Club and Moran have now filed motions for summary judgment. Supporting briefs and oral arguments were entertained by the court on July 1, 1996 and the matter is now ripe for disposition.

We begin our analysis of the instant motions with a brief review of the law governing summary judgment. When ruling on a motion for summary judgment, the court may consider pleadings, depositions, answers to interrogatories, admissions on file and supporting affidavits. Pa.R.C.P. 1035(a). In order to prevail in a motion for summary judgment, the moving party has the burden of proving that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. *Thompson Coal Co. v. Pike Coal Co.,* 488 Pa. 198, 412 A.2d 466 (1979); *Overly v. Kass,* 382 Pa. Super. 108, 554 A.2d 970 (1989). Further, summary judgment is only properly granted in cases where the right to judgment is clear and free from doubt, with any existing doubts being resolved in favor of the non-moving party. *Marks v. Tasman,* 527 Pa. 132, 589 A.2d 205 (1991); *Musser v. Vilsmeier Auction Co. Inc.,* 522 Pa. 367, 562 A.2d 279 (1989). Once a motion for summary judgment is made and supported under these principles, however, a non-moving party may not rest upon the mere allegations or denials of their pleadings. Rather, the non-moving party must set forth spe-

cific facts demonstrating that there is a genuine issue for trial. If he fails to do so, then summary judgment, if appropriate, shall be entered against him. Pa.R.C.P. 1035(d). With these standards in mind, we now turn to defendants' motion for summary judgment.

First, we note that plaintiff attempts to argue that her husband's limited tort election was not validly made, and therefore she should be deemed a full tort insured. The distinction as to whether plaintiff is a full tort insured as defined under the Motor Vehicle Financial Responsibility Law is critical for the following reason. If we find plaintiff is a full tort insured, then she may recover for noneconomic injuries; if we find she is a limited tort insured, then she may only recover for noneconomic injuries if she has sustained a serious injury, as defined more fully below. See 75 Pa.C.S. §1701 et seq. Adopting our analysis of the limited tort election that is set forth in *Tasso v. Young,* 3317 Civil 1994 (C.P. Monroe 1996), we find that plaintiff's husband made a valid limited tort election, and that plaintiff is bound by this election.

Having determined that plaintiff is a limited tort insured, we must next determine if she has sustained a serious injury, which is statutorily defined as "death, serious impairment of body function, or permanent, serious disfigurement." See 75 Pa.C.S. §1702. If plaintiff has sustained such an injury, then she is entitled to recover for noneconomic injuries, notwithstanding her limited tort election. See 75 Pa.C.S. §1791.1(b).

Our Superior Court recently ruled that the question of whether a plaintiff has sustained a serious injury is a question of law to be determined by the court. *Dodson v. Elvey,* 445 Pa. Super. 479, 665 A.2d 1223 (1995), *alloc. granted,* 1996 Pa. LEXIS 500 (1996). Further, the Superior Court has adopted a standard to

be used when determining if there has been a serious injury. The standard articulated by our Superior Court provides:

"The 'serious impairment of body function' threshold contains two inquiries:

"(a) What body function, if any, was impaired because of the injuries sustained in a motor vehicle accident?

"(b) Was the impairment of body function serious? The focus of these inquiries is not on the injuries themselves, but how the injuries affected a particular body function. Generally, medical testimony will be needed to establish the existence, extent and permanency of the impairment . . . In determining whether the impairment was serious, several factors should be considered: The extent of the impairment, the particular body function impaired, the length of time the impairment lasted, the treatment required to correct the impairment, and any other relevant factors. An impairment need not be permanent to be serious." *Dodson v. Elvey, supra* at 499, 665 A.2d at 1233-34, quoting *DiFranco v. Pickard,* 427 Mich. 32, 39, 398 N.W.2d 896, 901 (1986).

Reviewing these standards, and closely reviewing the pleadings, depositions, interrogatories and medical records of plaintiff's expert in the light most favorable to the plaintiff, we find that the injuries she sustained do not constitute a serious impairment of body function and thus do not qualify as a serious injury under the statute.

Immediately following the April 17, 1992 accident, plaintiff was transported to Pocono Medical Center where she was x-rayed. Her knee was placed in an immobilizer. She was given crutches and released. Approximately one week later, she saw Dr. Francis Lovec-

chio M.D. who diagnosed a resolving, severe patellofemoral contusion with a probable, traumatic osteochondritis of the right knee. He prescribed Tylenol with codeine and gentle range of motion exercises for her knee. When she returned to see Dr. Lovecchio two weeks later, his report indicates that her right knee was feeling a bit better, and his office notes indicate "her condition is stable and improving." Two weeks later on May 18, 1992, Dr. Lovecchio reported that "examination of her right knee reveals mild patellofemoral crepitus in the right knee but a negative patellar provocation test on the right, excellent stability of her right knee, no evidence of any interarticular effusion of her right knee and a slightly positive patellofemoral compression test on the right." Upon examination two weeks later on June 1, 1992, Dr. Lovecchio again indicated that she had moderate patellofemoral crepitus in her right knee. Doctor Lovecchio's report shows that on June 15, 1992 the plaintiff failed to show for an appointment but did appear on June 22, 1992 where his notes indicate "she has done well." By August 17, 1992, Dr. Lovecchio's office notes report that "she uses her exercise bicycle three times a week for an hour and a half. She is able to do her normal exercises. . . . She has full knee motion on the right knee with excellent stability and no pain. She has done well."

On November 2, 1992, Dr. Lovecchio's notes indicate "she came to see me for reevaluation. Over the past few weeks, she has had more and more anterior knee pain which affects her ability to walk. . . . She is obviously recurring and relapsing and despite the use of conservative care, she really has not improved over the past six to nine months. I think she should be arthro-

scoped." Doctor Lovecchio performed arthroscopic surgery on plaintiff's knee on November 25, 1992. In his report of the surgery he states "this patient had *moderate* patello/femoral discomfort over the past four to six months with knee flexion. . . ."

The plaintiff herself at her deposition admits that by May 3, 1993, she had no problems with her knee other than when "it rains or is very, very cold outside," at which time she has an ache.

Plaintiff argues that because she is precluded from extensive use of her stepping and rowing machines, that she can no longer squat to pick up a child, can no longer perform cartwheels and jumping while cheerleading and has difficulty scrubbing her floors on her hands and knees, she has sustained serious impairment of body functions. The above are the specific complaints plaintiff gave at her deposition which is attached to defendants' motion for summary judgment. Plaintiff also argues that she has permanent disfigurement due to the scars on her knee from arthroscopic surgery. Plaintiff's counsel also argued at oral argument that the approximate 60 to 90 minutes while under general anesthesia during the arthroscopic surgery, she was not capable of performing any physical functions and therefore for that period of time was permanently impaired. We note in Dr. Lovecchio's notes that she returned to visit with him in November of 1993 and at that time, he diagnosed a lateral hamstring tendonitis due to her extensive use of her NordicTrak, and he also noted that "she is quite involved with an athletic exercise program." At that time, his notes also indicate that she was still doing her biking exercises.

Plaintiff's deposition testimony at page 47, ll. 6-13 also gives us this information:

"Q. Do you have any scars or anything like that on your knee from the surgery?

"A. Yes. Three of them.

"Q. Just little half inch long—can you show them to me?

"A. I don't know if you'll be able to see through my pantyhose . . . ."

Considering the facts provided by plaintiff in her deposition and answers to interrogatories, as well as the information gleaned from Dr. Lovecchio's reports, her own expert witness and treating physician, and in light of the factors outlined in *Dodson v. Elvey,* we note the following as facts of which there is no genuine issue. The particular body function impairment sustained by plaintiff is her right knee. Regarding the length of time these impairments lasted, it appears that plaintiff's knee injuries have resolved completely and plaintiff has not seen a doctor for these injuries since June of 1993. Consequently, after reviewing the factors articulated in *Dodson v. Elvey,* we find that while plaintiff did sustain injuries, these injuries were not a serious impairment of a bodily function, as defined under the MVFRL.

Since plaintiff did not sustain a serious injury, she is precluded from recovering for noneconomic damages, including mental anguish and pain and suffering. Also, we note plaintiff's answers to interrogatories in which she seeks that she is not claiming any lost wages as she was not employed, lost future earning capacity or other damages. Similarly, we note that all medical expenses were paid and plaintiff's first party benefits have not been exhausted. Similarly, we find the remainder of the allegations contained in the complaint to be without merit.

Therefore, we enter the following order.

## ORDER

And now, July 17, 1996, it is hereby ordered and decreed that defendants Water Gap Country Club Inc. t/a and d/b/a Water Gap Country Club and John R. Moran and Christopher J. Moran's motion for summary judgment is granted.